IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

        v.                                 Criminal No. 3:22cr159 (DJN)

TIMOTHY CLARK,
     Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Timothy Clark's ("Defendant") Motion to Suppress and Incorporated Memorandum of Law ("Mot." or "Motion to Suppress" (ECF No. 17)), moving the Court to suppress (1) all evidence seized by law enforcement during a search of his person on September 23, 2021, and (2) all evidence seized during a subsequent search incident to arrest. The Government responded in opposition (ECF No. 18), and Defendant replied (ECF No. 19). On February 9, 2023, the Court held an evidentiary hearing on the Motion, rendering this matter ripe for review. For the reasons set forth below and from the bench, Defendant's Motion will be DENIED.[1]

## I. BACKGROUND

### A. Procedural History

On October 18, 2022, the grand jury returned a two-count indictment (the "Indictment") against Defendant. (ECF No. 1.) The Indictment charges Defendant with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1), and Possession of Controlled Substances (methamphetamine and cocaine), in violation of 21 U.S.C. § 844. (*Id.*) On January 6, 2023, Defendant filed his Motion to Suppress, arguing that (1) the police obtained

---

[1]    *See* Order (Denying Motion to Suppress) (ECF No. 26).

the evidence against him through an unlawful search of his person in violation of his Fourth Amendment rights and (2) that the later search incident to arrest would not have occurred but for the initial unlawful search. (ECF No. 17.) The Government responded in opposition on January 20, 2023, (ECF No. 18), and Defendant replied on January 26, 2023 ("Def. Reply" (ECF No. 19)). The Court held an evidentiary hearing on Defendant's Motion on February 9, 2023. ("Tr." (ECF No. 20).)

During the hearing, the Court heard testimony from Richmond Police Department ("RPD") Officers Taylor and Weekley on behalf of the Government. (Tr. 4:8–27:9, 51:13–56:7.) During Officer Taylor's testimony, the Government introduced a map of the relevant area of the City of Richmond (Tr. 7:11–12, Ex. 4A) and a then-outstanding warrant for Defendant (Tr. 23:5, Ex. 5). The Government also presented Body Worn Camera ("BWC") footage from Officers Taylor and Weekley depicting the stop. (Tr. 14:15, Gov. Ex. 3; Tr. 36:2, Gov. Ex. 1.) Defendant called no witnesses, relying solely on defense counsel's cross-examinations of Officers Taylor and Weekly and the BWC footage. (Tr. 27:10–47:7, 56:9–57:7.) After hearing Officers Weekly and Taylor's testimony and considering the evidence admitted during the hearing, the Court found Officers Taylor and Weekly credible. (Tr. 59:6.) Based on Officer Taylor and Officer Weekly's testimony, the evidence presented and the submissions of the parties, the Court now makes the following findings of fact.

### B.    Findings of Fact

1. On September 3, 2021, around 10 p.m., Officers Taylor and Weekley were on patrol in Richmond, Virginia's Fourth Police Precinct, colloquially known as part of the "Northside" neighborhood. (Tr. 6:3–25.)

2. Officers Taylor and Weekley saw Defendant driving northbound on 1st Avenue, around the 1800 block, in an older model Honda Civic with 2019 registration tags on the top right-hand corner of the license plate, indicating a two-years expired car registration. (Tr. 7:4–10, 8:14–16.)

2

3. Upon seeing the expired registration, Officer Taylor initiated a traffic stop by activating the patrol car's lights around the 1900 block of 1st Avenue. (Tr. 8:1–22, 9:10.) After being followed by the patrol car for three blocks, Defendant stopped his vehicle in the 2200 block of 1st Avenue. (Tr. 9:12; BWC Tr. at 1.)

4. The stop occurred 1.2 miles from Gilpin Court, a public housing area, and between Gilpin Court and Whitcomb Court, another public housing area. (Tr. 10:4–11:8; Ex. 4A.) This area is known among RPD Officers as a cut-through between multiple high-crime areas, making it a high crime area as well. (Tr. 11:17–12:4.)

5. Once Defendant stopped, Officer Taylor approached the driver's side door and Officer Weekley went to the passenger's side door. (Tr. 12:15–24.) Officer Taylor asked for Defendant's license; Defendant did not have one. (Tr. 13:1–8; BWC Tr. at 1.)

6. Officer Taylor asked Defendant twelve times to exit his car as Defendant did not have a valid license to permit him to operate a motor vehicle, and Officer Taylor wanted to step out of traffic while collecting Defendant's information. Defendant refused every time. (Tr. 13:13–14:6; BWC Tr. at 1–2.) Defendant informed Officer Taylor that he was on his way to bring food to his girlfriend. (BWC Tr. at 1.)

7. Defendant's repeated refusal to exit his vehicle aroused a suspicion in Officer Taylor that Defendant was concealing contraband. Officer Taylor therefore twice asked Defendant if he possessed any illegal items. Defendant ignored Officer Taylor's questions and avoided eye contract, further arousing Officer Taylor's suspicion of illegal activity. (Tr. 17:18–24, 20:9–13; BWC Tr. at 2.)

8. Defendant reached towards his right pants pocket where Officer Taylor could not see Defendant's hand. Officer Taylor then asked Defendant to place his hands on the steering wheel, before again asking him to exit the vehicle. (Tr. 17:25–18:9; BWC Tr. at 2.) Later, Defendant again moved his hands to his right side. (Tr. 48:12–49:12.) Based on these repeated movements towards his right side, Officer Taylor grew concerned that Defendant was armed. (Tr. 18:17–19.)

9. RPD Officers are taught that "[h]ands can kill you. They can grab things that — like guns, potentially, that can kill you." (Tr. 18:10–17.) RPD Officers also receive training in how to identify when a person may be armed. This training teaches that when people are armed, they instinctively touch their firearms to ensure that the gun remains concealed and within their possession. (Tr. 19:1–16.)

10. After three minutes of repeated entreaties for Defendant to exit his vehicle, Defendant exited the car. He did so only after Officer Weekley informed him that officers have the right to "yank" him out of the vehicle. Officer Taylor then instructed Defendant to walk to the rear of the vehicle, out of traffic. Once there, Officer Taylor intended to pat Defendant down due to Defendant's repeated refusal to exit the vehicle, Defendant's reaching around to his pocket on the right side, Defendant's refusal to answer questions

and the area of the stop.  Defendant, however, refused to go towards the rear of the vehicle.  (Tr. 19:20–20:21; BWC Tr. at 2.)

11. Rather, once outside the car, Defendant turned away from Officer Taylor and faced the vehicle.  Officer Taylor again asked Defendant if he had anything on him and Defendant again did not respond.  (Tr. 20:25–21:9.)

12. Officer Taylor, standing on Defendant's left, began to pat down Defendant's left side. Three seconds later, in the midst of the pat down, Officer Weekley, observed a firearm in Defendant's right-hand pocket and informed Officer Taylor, saying, "He's got a gun right there, in his pocket."  (Tr. 21:10–22-7, 54:23–55:5; BWC Tr. at 2.)  The gun visibly protruded from Defendant's right front pants pocket and Officer Taylor did not need to go into the pocket to retrieve it.  (Tr. 22:14–20, 54:23–55:19.)

13. Defendant then walked away from the officers.  Officer Weekley grabbed Defendant and attempted to place him under arrest.  Defendant then began resisting Officer Weekley and headbutted Officer Taylor, breaking Officer Taylor's left front tooth.  (Tr. 22:21–23:1; BWC Tr. at 3.)

14. Following his arrest, Defendant provided Officer Taylor with his Social Security Number.  Officer Taylor ran a warrant check on Defendant and found an outstanding arrest warrant, issued August 20, 2021, from Charlotte County, Virginia, for Defendant. (Tr. 23:6–24:6; Ex. 5.)

15. After Defendant's arrest, another RPD officer searched Defendant and found drugs on him.  (Tr. 55:20–23.)

## II.   ANALYSIS

Defendant moves to suppress the firearm and narcotics evidence that the police seized during the search of his person that followed a traffic stop.  In support of his Motion, Defendant offers four arguments.  First, Defendant contends that Officer Taylor lacked the reasonably articulable suspicion that Defendant was armed and dangerous necessary to search Defendant for weapons under the second prong of *Terry v. Ohio*.  (Mot. at 6–9); *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009) ("First, the investigatory stop must be lawful . . . Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.") (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  Second, as a result of the exclusionary rule, Defendant asserts that evidence of the gun found during the unlawful search must be

4

suppressed. (Mot. at 9–12). Further, Officer Weekly's exclamation, "He's got a gun right there in his pocket," (BWC Tr. at 2), does not cure the taint of the illegal search as the two acts were simultaneous and connected to the search, thus, the statement could not be an intervening circumstance. (Mot. at 10–12.) Third, following the Supreme Court's recent holding in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122 (2022) (holding that citizens have a Second Amendment right to carry handguns in public for personal safety), Fourth Circuit caselaw can no longer equate "armed" with "dangerous" under *Terry*; each must be established independently. (Mot. at 13–17.) Fourth, drug evidence found during the search incident to arrest must be suppressed as it was the product of the initial illegal search. (Mot. at 18); *see Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (evidence obtained by "exploitation of [ ] illegality" must be suppressed).

The Court disagrees with Defendant's assessment on all four fronts. The Court first finds that Officer Taylor had reasonable suspicion that Defendant was armed and dangerous, such that the officers had grounds to frisk Defendant. *See United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013) (holding that factors such as "the context of the stop, the crime rate in the area, . . . the nervous or evasive behavior of the suspect . . . [and] suspicious movements" can suggest that the suspect has weapons). Alternatively, even if Officer Taylor began the initial frisk without articulable reasonable suspicion, Officer Weekly observed Defendant's firearm in plain view and could seize it to ensure officer safety. *United States v. Isham*, 501 F.2d 989, 991 (6th Cir. 1974) (interpreting *Terry* as permitting officers to temporarily seize a weapon that was not obvious contraband on the officers' reasonable belief that the seizure was necessary to protect the officers' safety). And, because there was an outstanding warrant for Defendant's arrest, Officers Taylor and Weekly would have inevitably discovered the gun in a subsequent search incident to

arrest. *Nix v. Williams*, 467 U.S. 431, 444 (1984) (improperly seized evidence can nevertheless be admitted if, the court finds "by a preponderance of the evidence," that "the information ultimately or inevitably would have been discovered by lawful means"). Lastly, the Court concludes that cases equating "armed" and "dangerous" survive *Bruen*. *See United States v. Robinson*, 846 F.3d. 694, 700 (4th Cir. 2017) (holding that the issue in the case was whether the suspect was "reasonably believe[d] to be armed, regardless of whether the person may legally be entitled to carry the firearm"). Accordingly, the Court finds that Officers Taylor and Weekley did not violate Defendant's Fourth Amendment rights during either the initial pat down or the search incident to arrest. The Court will therefore DENY Defendant's Motion (ECF No. 17), thereby allowing the evidentiary use of both the firearm and narcotics.

### A.    Traffic Stops and Searches Under the Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Thus, "the underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). "Evidence gathered as a fruit of an unreasonable search or seizure is generally inadmissible against a defendant." *United States v. Brown*, 402 F.3d 588, 592 (4th Cir. 2005) (citing *Taylor v. Alabama*, 457 U.S. 687, 694 (1982)).

When law enforcement stops a vehicle and detains its occupants, the stop constitutes a seizure under the Fourth Amendment, "no matter how brief the stop or how limited its purpose." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). Courts assess the reasonableness of traffic stops under the two-prong framework announced in *Terry*. 392 U.S. at 27. Pursuant to *Terry*, the Court asks (1) whether the officer's actions were legitimate at their inception and (2)

whether the officer's actions "during the traffic stop were reasonably related in scope to the bases for the seizure." *United States v. Palmer*, 820 F.3d 640, 648–49 (4th Cir. 2016).

Under *Terry*'s first prong, an initial stop proves legitimate where "the officer [has] probable cause to believe a traffic violation occurred[,]" *United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022), such as when they themselves witness such a violation. *Branch*, 537 F.3d at 335. It is well-settled that "expired license tags" justify an initial stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). Further, despite the "additional intrusion" into a suspect's liberty when forced to exit his vehicle during a traffic stop, the officer's interests in visibility, avoiding traffic and officer safety justify this intrusion. *Id.* at 110–11.

Under *Terry*'s second prong, however, police must show reasonably articulable suspicion that a suspect is armed and dangerous to subject him to a pat down. *Id.* at 111–12. Reasonable suspicion is an objective standard, which requires examination of the "facts within the knowledge [of the officers]." *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (the Government "bears the burden of articulating facts sufficient[ly]"). However, an officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *Robinson*, 846 F.3d at 700. Further, multiple factors together can contribute to an articulation of reasonable suspicion, even when each alone would be insufficient. *George*, 732 F.3d at 299 (examining the totality of the circumstances).

The Court now turns to the application of this law to Defendant's Motion.

1.   **The stop was reasonable because Officers Taylor and Weekley saw Defendant's expired registration tags,**

First and foremost, the Court holds, and Defendant does not contest, that the stop was reasonable under *Terry* and that the Officers could order Defendant to exit his vehicle. (Tr.

7

59:20–22 ("[Defendant is] not disputing the legitimacy of the stop for the expired registration, nor . . . disputing the order to get out of the car.")); *Mimms*, 434 U.S. at 109–11 (holding that expired license tags justify a traffic stop and that police can order a suspect out of his car). As such, the Court now turns to whether the subsequent pat down by Officer Terry was reasonable under the Fourth Amendment.

### 2.   Officers Taylor and Weekly had reasonable suspicion that Defendant was armed and dangerous.

Officer Taylor had reasonable articulable suspicion that Defendant was armed and dangerous before initiating the pat down of Defendant.[2]  Under the second prong of *Terry*, officers must articulate reasonable suspicion that a suspect is armed and dangerous. 392 U.S. at 111.  However, the issue remains solely "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27; *Robinson*, 846 F.3d at 700 (holding that reasonable suspicion a suspect is "armed" makes the suspect "therefore dangerous").  Reasonable suspicion can be met by a multitude of factors when taken together, even if each alone remains insufficient. *George*, 732 F.3d at 299 (examining the totality of the circumstances).  Courts may consider "the context of the stop, the crime rate in the area, . . . the nervous or evasive behavior of the suspect . . . [and their] suspicious movements," among other factors. *Id.*

Here, Officers Taylor and Weekley's testimony, and their BWC footage, support their reasonable suspicion that, at the time of the pat down, Defendant was "armed and therefore dangerous." *Robinson*, 846 F.3d at 700.  Indeed, the record reflects ample evidence supporting Officers Taylor and Weekley's reasonable suspicion.  First, the stop occurred at 9:57 p.m. in the

---

[2]     Defendant also contests the Fourth Circuit's conflation of "armed" with "dangerous" following the recent Supreme Court holding in *Bruen*. *See* Section II.A.3 (discussing *Robinson* and *Bruen*).

2100 block of 1st Avenue.  (Tr. 6:3–25.)  The late evening time heightens an officer's suspicion. *United States v. Foster*, 634 F.3d 243, 247 (4th Cir. 2011) (finding that the lateness of the hour when the stop occurred is a factor in developing reasonable suspicion).  Additionally, the location — what Officer Taylor described as a high-crime area because people use it as a "cut through" between Gilpin Court and Whitcomb Court, two public housing projects, which themselves are high crime areas — further added to the Officers' suspicion.  (Tr. 10:4–11:8, 11:17–12:4; Ex. 4A); *Robinson*, 814 F.3d 201, 212 (4th Cir. 2016), *on reh'g en banc*, 846 F.3d 694 (4th Cir. 2019) ("[T]he Supreme Court indeed has held that presence in a high-crime area may contribute to a finding of reasonable suspicion.") (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

This context was exacerbated by the actions of Defendant.  The officers followed Defendant's car for multiple blocks, with their lights on, before he stopped.  (Tr. 9:12; BWC Tr. at 1.)  While being questioned, Defendant acted evasively and looked away from Officer Taylor when speaking to him.  (Tr. 17:18–24; BWC Tr. at 2); *United States v. Mayo*, 361 F.3d 802, 807–08 (4th Cir. 2004) (holding that, among other factors, the defendant's "unusually nervous behavior" and "averting his eyes to avoid those of the officers" constituted reasonable suspicion that the defendant was armed and dangerous).  Throughout the stop, Defendant repeatedly failed to comply with both officers' orders and remained noncompliant.  (Tr. 13:13–23:1.)  Defendant failed to answer questions, including whether he had contraband or illegal items in the car or on his person.  (Tr. 17:18–24, 20:25–21:9; BWC Tr. at 2.); *United States v.* Johnson, 2022 WL 2373700 (E.D. Va. June 30, 2022) (factoring resistance to answering law enforcement officer's questions and declining to comply with requests to exit a vehicle, among other factors, into whether the officer had reasonable suspicion).  Defendant refused to get out of the car until he

9

was told that he could be "yanked out." (Tr. at 19:20–20:21; BWC Tr. at 2); *see, e.g., id.*; *United States v. Barnes*, 153 Fed. App'x 232, 235 (4th Cir. 2005) (holding that, among other factors, including furtive movements, the defendant's refusal to exit vehicle supported officers' reasonable suspicion that the defendant was armed). And once outside of the car, Defendant failed to move to the rear of the car to get out of the way of traffic as directed by the officers. (Tr. 20:25–21:9); *George*, 732 F.3d at 301 (finding that failure to comply with a direct order by an officer "can contribute to reasonable suspicion").

While in the car, Defendant also furtively moved his right hand on his right side, out of sight of Officer Taylor. (Tr. at 17:25–18:9, 48:12–49:12; BWC Tr. at 2); *see, e.g., United States v. Davis*, 742 F. App'x 714, 716 (4th Cir. 2018) (holding that hand movements in the cabin of the defendant's vehicle "lent support to a finding of reasonable suspicion"); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (finding that officers had reasonable suspicion that the defendant was armed and dangerous when "[t]wice [the defendant] disobeyed an order to raise his hands, and he made furtive movements inside the truck where his hands could not be seen"). Officer Taylor testified that law enforcement officers are trained to look for this, as suspects who are armed often subconsciously touch the location of their firearm to ensure that it remains there. (Tr. at 18:10–17, 19:1–16); *cf. George*, 732 F.3d at 299 ("A suspect's hand movements can . . . be taken to suggest that the suspect may have a weapon."). Unsurprisingly, Officer Taylor ultimately retrieved Defendant's gun from his right front pocket, the same location that Defendant repeatedly touched. (Tr. 22:14–20, 54:23–55:19.)

Taken together, the context and location of the stop combined with Defendant's evasive movements and his dogged non-compliance supported the articulable reasonable suspicion that Defendant was armed and dangerous. (Tr. at 19:20–20:21); *George*, 732 F.3d at 299. Officer

Taylor's pat down of Defendant did not violate Defendant's right to be free from unreasonable search and seizure under the Fourth Amendment.[3] Thus, Defendant's Motion fails on this ground.

**B.      Defendant's gun "sticking out" of his pocket in plain view was temporarily seized to ensure officer safety.**

Independent of the pat down, when Defendant exited the car, Officer Weekley almost immediately saw the firearm on Defendant's right side as it partially protruded from Defendant's right pants pocket. (Tr. 21:10–22-7, 54:23–55:5; BWC Tr. at 2.) Thus, Officer Weekly spotted Defendant's gun in "plain view" — sticking out of Defendant's pants pocket — and alerted Officer Taylor concomitantly to the search. In Officer Weekley's BWC footage, the gun is clearly visible in Defendant's right, front pants pocket. (BWC Tr. at 2.) Weekley then alerted Taylor, "He's got a gun right there, in his pocket." (*Id.*) At the time that Weekley alerted Officer Taylor, Taylor was in the midst of patting down Defendant on his left side of his body. He had not yet reached Defendant's right side or the location of the firearm. (Tr. 21:10–22-7, 54:23–55:5; BWC Tr. at 2.) Thus, Officer Weekley alerting Officer Taylor to the presence of the gun occurred regardless of the pat down. Additionally, when Officer Taylor moved to the right of Defendant's body, he saw the gun and retrieved the gun without reaching into Defendant's pocket.[4] (Tr. 22:14–20, 54:23–55:19.)

---

[3]      As the Court finds the initial search of Defendant lawful, the Court need not address whether the evidence found during the search incident to Defendant's arrest should be suppressed. No poisonous tree exists, thus, there is no poisonous fruit. *Cf. Wong Song*, 371 U.S. at 471 (suppressing "fruit of the poisonous tree"). Consequently, the Court hereby DENIES Defendant's Motion to Suppress with regard to the drug evidence recovered during the search incident to arrest.

[4]      As the firearm "[wa]s left in open view and [wa]s observed by a police officer from a lawful vantage point, there [was] . . . no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment . . ." *Dickerson*, 508 U.S. at 375.

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."[5] *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Jackson*, 131 F.3d 1105, 110 (4th Cir. 1997) ("[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent.") (citing *Horton v. California*, 496 U.S. 128, 126–27 (1990)). Under the third prong, an object's incriminating character is "immediately apparent" if a police officer, upon seeing it, has probable cause to believe that it is "evidence of a crime or is contraband." *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987); *Dickerson*, 508 U.S. at 375 (if further search is required to determine an object's criminality, "the plain-view doctrine cannot justify its seizure.").

Here, there exists no dispute that the first two prongs of the plain view doctrine are satisfied. First, Officers Taylor and Weekley were lawfully in a position to see the gun because (1) they lawfully stopped Defendant's car due to his expired registration tags and (2) they lawfully ordered Defendant out of his vehicle. *Mimms*, 434 U.S. at 109–11. Second, the officers had a lawful right of access to the object as the officers could observe Defendant's person unobstructed on the public street. *United States v. Davis*, 690 F.3d 226, 234 (4th Cir. 2012) ("[T]he lawful access requirement is intended to clarify that police may not enter a premises to

---

[5]    Defendant's Motion argues that "there was no proper ground for the officers to seize the gun, because there was no reason to believe Mr. Clark was 'dangerous' as well as 'armed.'" (Mot. at 13.) While Defendant's Motion focuses on the necessity to have separate suspicion of a defendant's armed state from dangerousness, *see infra*, the Court will still address the underlying issue of the seizure.

make a warrantless seizure, even if they could otherwise see [the object] (from a lawful vantage point)[.]") (citing *Horton*, 496 U.S. at 137, n.7).

The third prong, however, is not so readily satisfied as "the police lack[ed] probable cause to believe that [the gun] in plain view [wa]s contraband without conducting some further search of the object," thus its "incriminating nature was not immediately apparent and 'the plain view doctrine cannot justify its seizure.'" *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014) (quoting *Dickerson*, 508 U.S. at 375). Here, at the time of plainly viewing and seizing the gun, Officers Weekley and Taylor remained unaware of Defendant's felon status, which would render his possession of a firearm illegal. Thus, the gun did not immediately appear to be contraband nor evidence of a crime. However, this does not mean that the officers could not temporarily seize Defendant's gun for safety reasons.

The Supreme Court in *Coolidge v. New Hampshire* indicated that the plain view exception may permit the warrantless seizure of "objects dangerous in themselves." 403 U.S. 443, 472 (1971) (plurality). Similarly, four Circuit Courts have held that, under the plain view doctrine, "[t]emporary seizures of persons or objects may be permissible when reasonably connected to the safety of officers or the protection of others." *See, e.g.*, *Gordon*, 741 F.3d at 71 (upholding the temporary seizure of a gun in plain view) (citing *United States v. Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004) and *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1075 (10th Cir. 2010)). Thus, "for the seizure of a gun in plain view (and which is not obvious contraband) to be reasonable under the Fourth Amendment, a police officer must reasonably believe, based on specific and articulable facts, that the weapon posed an immediate danger to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003). This is because "common sense dictates that a firearm that could be accessed by someone at the scene

13

and used against officers or others should be unloaded, and at least temporarily, kept in a safe place." *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010). The "temporary seizure, unloading, and retention by a responsible officer [of a handgun] . . . seems a reasonable precaution to assure the safety of all persons on the premises[.]" *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir. 1979) (holding this despite the fact that the incriminating nature of the handgun may not have been immediately apparent).

This line of cases is further bolstered by the Supreme Court's and the Fourth Circuit's holdings in cases regarding law enforcement officer safety, particularly those involving guns. It is well-settled that a law enforcement can, among other things: pat down a defendant to look for weapons to protect the officer and bystanders, *Terry*, 392 U.S. at 29 (holding that frisk's "sole justification . . . is the protection of the police officer and others nearby"); *Robinson*, 846 F.3d at 696 ("[A]n officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and the safety of everyone on the scene."); order a driver and passenger out of a vehicle during a traffic stop in the name of officer safety, *Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("[T]he same weighty interest in officer safety is present regardless of whether the occupant . . . is a driver or passenger."); *Mimms*, 434 U.S. at 109 (ordering driver out); ask a suspect whether there is anything illegal in the vehicle, *United States v. Buzzard*, 1 F.4th 198, 203 (4th Cir. 2021) (finding the question related to officer safety); and can generally "engage in certain safety measures." *United States v. Perez*, 30 F.4th 369, 375 (4th Cir. 2022) (quoting *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). These actions are supported by the repeated holdings that the safety of an officer "is both [a] legitimate and weighty" justification for police actions taken during a traffic stop, due to the "inordinate risk confronting an officer." *Mimms*, 424 U.S.

14

at 110 ("[A] significant percentage of murders of police officers occurs when the officers are making traffic stops.") (quotation omitted); *see Perez*, 30 F.4th at 356 ("Traffic stops are especially fraught with danger to police officers, . . . an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely."). The temporary seizure of a firearm during a traffic stop, thus, is merely the officer "engag[ing] in certain safety measures" to ensure his safety and the safety of the public. *Perez*, 30 F.4th at 375.

With regard to Defendant, while Officers Taylor and Weekley lacked knowledge of Defendant's prior felony conviction, the officers reasonably believed that the gun that Defendant possessed posed a threat to both officers. *See, e.g.*, *Bishop*, 338 F.3d at 628 (requiring articulable facts of danger for the seizure to be reasonable); *cf. id* (finding actions justified based on the need for officer safety). Up to that point, Defendant had repeatedly disobeyed and ignored Officer Taylor's orders, furtively moved his hands towards the gun's location and refused to answer questions as to whether he had anything illegal on him, such as a gun. (Tr. 17:18–18:9, 20:25–21:9.) All of these actions led the officers to believe that Defendant was armed and dangerous. (Tr. 18:10–17 ("We've been taught that we always need to be able to see somebody's hands . . . Hands can kill you. They can grab things that — like guns, potentially, that can then kill you.").)

Furthermore, following the seizure of the gun, Defendant attempted to evade arrest and, when Officer Weekley attempted to handcuff him, Defendant fought the officers, going so far as to headbutt Officer Taylor. Thus, there is no doubt that "the weapon posed an immediate danger" and "heightened the risk of violence in connection with a possible confrontation," which ultimately did occur. *Bishop*, 338 F.3d at 628. Therefore, as Officer Weekley saw the gun in plain view, Officer Taylor lawfully temporarily seized the gun to ensure his and his partner's safety. *See, e.g.*, *Malachesen*, 597 F.2d at 1234–35 ("A loaded, cocked handgun poses a threat to

15

anyone within its range of fire.  Moreover, temporary seizure undercuts the chance of mishap[,] the accidental discharge of the handgun . . . or even its intentional use[.]").  By eliminating this threat through temporary seizure, Officer Taylor reasonably ensured the safety of all participants and did not violate Defendant's Fourth Amendment rights.

Furthermore, the temporary seizure became a lawful "permanent" seizure once the police officers discovered Defendant's felon status and "the gun became contraband." *Bishop*, 338 F.3d at 628 (finding that a firearm's loaded status violated state law and, thus, became subject to seizure).  This case parallels the Sixth Circuit's decision in *Gordon*: "when [the officer] learned of the [defendant's] prior conviction, the incriminating nature of the temporarily seized shotgun became known — it was contraband and subject to seizure as an illegal weapon possessed by a felon."  741 F.3d at 71–72.  So too here.  Once Officer Taylor ran Defendant's information in the system and became aware of Defendant's felon status, as well as an outstanding warrant for his arrest, the gun became contraband, and the officers could lawfully seize it.  *See Bishop*, 338 F.3d at 628 (upholding a firearm seizure once officers became aware of its contraband status).  Consequently, the temporary seizure doctrine defeats Defendant's Motion, as well.

C.      **Defendant's outstanding warrant for his arrest made evidence found during the search of Defendant inevitably discoverable.**

Even if the Court had found that Officer Taylor's frisk of Defendant was not reasonable, under the "inevitable discovery doctrine," the officers would have discovered Defendant's gun during a subsequent, legal search incident to arrest.  Thus, the evidence would be admissible under the inevitable discovery doctrine as well.

Even absent articulable reasonable suspicion that a suspect is armed and dangerous, the "inevitable discovery doctrine" can render admissible evidence found by an otherwise illegal search under the Fourth Amendment.  "The inevitable discovery doctrine may apply where

16

additional routine or factually established investigative steps would inevitably lead to discovery

of the evidence without undertaking any search." *United States v. Allen*, 159 F.3d 832, 841 (4th

Cir. 1998); *Nix*, 467 U.S. at 444 (admitting improperly seized evidence if "the prosecution can

establish by a preponderance of the evidence that the information . . . inevitably would have been

discovered by lawful means"). Inevitable discovery can occur via additional anticipated

searches, such as a search incident to arrest. *United States v. Herman*, 828 Fed. App'x 894, 897

(4th Cir. 2020).

Defendant attempts to distinguish between primary and derivative evidence under the

inevitable discovery doctrine.[6] (Def. Reply at 9–11; Tr. 69:21–73:73.) Defendant argues that the

gun constitutes "primary" evidence under *Nix* and the deterrence rational of the exclusionary rule

would be served by excluding the evidence; thus, the Court should not apply the inevitable

discovery doctrine to the "primary" firearm evidence and should limit the doctrine's application

to "derivative" evidence. (Def. Reply at 9–11; Tr. 69:21–73:73.) However, the Fourth Circuit

does not distinguish between derivative and primary evidence with regard to the inevitable

discovery doctrine: both primary and derivative evidence need not be excluded if it would have

been inevitably found. *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987) (holding

that the inevitable discovery rule should be applied to evidence discovered during the first

invalid search).

Here, while the gun constitutes primary evidence and the drugs are derivative evidence,

both items would have been found had Defendant provided his license or any form of

identification during the traffic stop when requested by Officer Taylor. *United States v.*

---

[6]     Defendant argues that under *Nix*, the "primary" evidence — an illegally obtained
confession — was not at issue, instead the Court admitted the "derivative" evidence — the body
found as a result of the confession — due to the inevitable search doctrine. 467 U.S. at 434, 441.

*Arellano*, 410 Fed App'x 603, 606 (4th Cir. 2011) (finding that evidence would have been inevitably discovered due to impounding of the suspect's car following arrest due to a refusal to provide a valid license, registration or address). Instead, following his arrest, when Defendant provided the officers with his Social Security Number, Officer Taylor ran a search and uncovered an outstanding warrant for Defendant's arrest. (Tr. 23:6–24:6; Ex. 5.) This warrant, alone, provided grounds upon which the officers would have arrested Defendant. Thus, in turn, this warrant would have prompted a legal search incident to arrest, during which the officers would have uncovered both the drugs and the gun. *See, e.g., Herman*, 828 Fed. App'x at 897 (applying the inevitable search doctrine to admit evidence that inevitably would have been found due to a subsequent arrest of the defendant for driving under the influence). This entire process could have occurred before, and instead of, the pat down that Defendant received had he surrendered any personal identification information. Thus, under the inevitable discovery doctrine, because the officers would have searched Defendant pursuant to a search incident to arrest — and found the gun and drugs — due to his outstanding warrant, the Court may not exclude the evidence of the gun and drugs as fruit of an illegal search. *Allen*, 159 F.3d at 841 (finding that the doctrine applies "where the facts indicate another search inevitably would have occurred and would inevitably have uncovered the evidence, and that search falls within an exception to the warrant requirement") (citing *United States v. George,* 971 F.2d 1113, 1121–22 (4th Cir. 1992) (inventory search) and *United States v. Cotnam,* 88 F.3d 487, 496 (7th Cir. 1996) (search incident to arrest)).

Having found that Officer Taylor lawfully patted down Defendant and, additionally, that plain view's temporary seizure and the inevitable discovery doctrines apply, the Court now turns to Defendant's argument that the Supreme Court's recent decision in *New York State Rifle &*

*Pistol Ass'n v. Bruen* disrupts the Fourth Circuit's precedent that conflates armed with dangerous.

**D.**     ***New York State Rifle & Pistol Ass'n v. Bruen* does not change Fourth Circuit precedent equating "armed" with "dangerous."**

Defendant argues that the Supreme Court's recent holding in *Bruen* alters the Fourth Circuit's en banc opinion in *United States v. Robinson* equating armed with dangerous under *Terry*'s second prong.  (Mot. at 13–17.)  The Court disagrees.

Initially, a district court is bound by the precedent of the circuit court in which it sits. *Fisher-Borne v. Smith*, 14 F. Supp. 3d 695, 697 (M.D.N.C. 2014) ("A decision by a circuit court is binding on this court.").  "Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) (citing *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939))).  Thus, Fourth Circuit precedent binds the Court.  And this applies with even greater force to *en banc* decisions.  *Cf. United States v. Ruhe*, 191 F.3d 376, 388 (4th Cir. 1999) (noting that even a circuit panel is bound by prior precedent from other panels in the circuit "absent contrary law from an *en banc* decision").

While Supreme Court precedent does trump Fourth Circuit precedent, *Ins. Grp. Comm. v. Denver & Rio Grande W. R.R. Co.*, 329 U.S. 607, 612 (1947), here, the Fourth Circuit directly addressed in *Robinson* the same issue at play in the instant case — whether armed equates to dangerousness: "[t]he danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon," thus an officer can reasonably suspect that someone is "armed and *therefore* dangerous."  846 F.3d at 696, 700.  Meanwhile, in *Bruen*, the Supreme Court held that the Second Amendment protects a citizen's general right to carry a

handgun outside of the home for self-defense. 142 S. Ct. at 2122. This holding neither disturbs the Court's adherence to *Robinson* nor affects the outcome of this Motion.

Under *Robinson*, the controlling law of this circuit, the legality of the firearm at issue in the search or seizure matters naught: it is "inconsequential that the [suspect] may have had a permit to carry the concealed firearm. The danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, *not from any illegality of the weapon's possession.*" *Robinson*, 846 F.3d at 696 (emphasis added) (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972) and *Michigan v. Long*, 463 U.S. 1032, 1052 n.16 (1983)). The court, thus, rejected the defendant's argument, which "presume[d] that the legal possession of a firearm cannot pose a danger to police officers during a forced stop," and "fail[ed] to recognize that traffic stops alone are inherently dangerous to police officers . . . [and] that traffic stops of persons who are armed, whether legally or illegally, pose yet a great safety risk[.]" *Id.* at 698 (also rejecting the idea that "when a person forcefully stopped maybe legally permitted to possess a firearm, any risk of danger to police officers posed by the firearm is eliminated"). The court held, as a result, that because the risk inherent in traffic stops increases with the presence of a firearm — which can be used fatally against the stopping officers — "when the officer reasonably suspects that the person [that] he has stopped is armed, the officer is 'warranted in the belief that his safety . . . [is] in danger.'" *Id.* at 399 (quoting *Terry*, 392 U.S. at 27).

This concern for the officers' safety existed here. Officers Taylor and Weekley had reasonable suspicion that Defendant was armed and dangerous based on his conduct, regardless of the legality of the gun. Furthermore, their suspicions of Defendant bearing arms *and* being dangerous both bore true. Officer Taylor articulated numerous factors that led him to reasonably suspect that Defendant was armed: Defendant's furtive movements, evasive answers to

questions, lack of eye contact, repeated touching of his right side and noncompliance with almost

all orders. (Tr. 17:18–18:9, 20:25–21:9); *George*, 732 F.3d at 299 (holding that factors such as

"the context of the stop, the crime rate in the area, . . . the nervous or evasive behavior of the

suspect . . . [and] suspicious movements" can suggest that the suspect has weapons).

Thus, the officers articulated reasonable suspicion of dangerousness because "the risk of

danger is created simply because the person, who was forcibly stopped, is armed." *Robinson*,

846 F.3d at 700.  The legality, or, in this case illegality, of the gun does not factor into the

analysis whatsoever as to whether Defendant presented a danger to the officers.  The Fourth

Circuit explicitly held the opposite:  Defendant's dangerousness exists solely because he is

armed during a traffic stop.  This alone remains sufficient.  Additionally, this reasoning parallels

the rationales behind actions taken in the name of officer safety, such as temporary seizure of a

firearm when seen in plain view during a search.  *See, e.g.*, *Bishop*, 338 F.3d at 626 (noting that

the Sixth Circuit has "approved of police seizure of a weapon that was not obvious contraband

based on an officer's reasonable belief that the weapon posed a threat to officer safety").  The

legality of the gun in both situations remains irrelevant as to the dangerousness posed by

possession of the firearm.

Beyond the inherent danger in all traffic stops, however, the Court finds that Defendant

was dangerous regardless of his gun possession.  Defendant resisted arrest and attempted to flee

on foot from the officers. (Tr. 22:21–23:1.)  Once caught by Officer Weekley, Defendant fought

him and eventually had to be forced onto the ground to be handcuffed.  (*Id.*)  During the scrap,

Defendant headbutted Officer Taylor, breaking his front tooth and forcing him to visit the

hospital.  (*Id.*)  Even post-arrest, Defendant continued to physically fight the officers.  (*Id.*)

Defendant's dangerousness underscores the futility of an inquiry into the legality of a firearm

21

during a traffic stop.  As mentioned above, traffic stops pose an immense threat to officer safety. "Of the 51 law enforcement officers feloniously killed in the line of duty in 2014, 9 officers (or 18%) were fatally injured during traffic pursuits or stops."  *Robinson*,  846 F.3d at 699 (citing FBI, *Officers Feloniously Killed*, *in* Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted, 2014).  Thus, whether or not a suspect possesses a gun legally matters not as to whether the gun poses a safety threat to the officers.

The Court is bound by the Fourth Circuit's *en banc* precedent in *Robinson* until the Fourth Circuit reconsiders the issue or the Supreme Court addresses this issue head on.  As a result, under *Robinson*, the evidence clearly establishes Defendant's "armed and dangerous" status, regardless of whether the officers knew at the time of the stop that he possessed the gun illegally.  Thus, the Court DENIES Defendant's Motion on this ground, as well.

### III.    CONCLUSION

For the reasons stated above, the Court finds that Officers Taylor and Weekly did not violate Defendant's Fourth Amendment rights during the September 23, 2021 traffic stop. Accordingly, the Court will DENY Defendant's Motion to Suppress.  (ECF No. 17.)

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  March 16, 2023

22